District of Columbia police officer, individually and in his official capacity, and Ryder, DC police officer, individually and in his official capacity. Mr. Scarafano for the appellant, Mr. Shipley for the appellant. May it please the court. My name is Joseph Scarafano. I represent Jonathan Hedgpeth in a civil suit against Metropolitan Police Department officers Matthew Ryder and Ammar Rahim. We are asking the court to reverse the district court's decision granting summary judgment in favor of defendants Rahim and defendant Ryder as to Hedgpeth's claim to false arrest and excessive force in violation of 42 U.S.C. 1983. The record, when viewed in the light most favorable to the plaintiff, does not support directly or by inference that two factual transactions occurred between Mr. Hedgpeth and two separate individuals, tall, African-American, or otherwise. Our contention is that the incident described by the officers and described by Marcus Lee is the same incident. Both officers Rahim and Ryder testified almost uniformly to a continuing series of events that exclude any reference to Marcus Lee, who was on the scene from start to finish. Officers Rahim and Officer Rahim and Officer Ryder both described what they were doing before they encountered Mr. Hedgpeth. They described the run-up to that incident, and based on the record before the court, the testimony of Officer Rahim, Officer Ryder, and Marcus Lee, there is no timing that would provide for two separate factual transactions. Mr. Scrippano, assuming that we, as we must in the current procedural posture, accept the evidence in the record that supports your client and draw all inferences in his favor, we nonetheless have testimony of Marcus Lee that the officers sought to arrest Mr. Hedgpeth and asked him, grabbed his right hand and asked him for his testimony. And that he was not cooperating, and that it was only then that the officer, Officer Rahim, used the takedown maneuver and that he did so without any apparent effort to slam Mr. Hedgpeth, but just to get him under control, to arrest him. If we assume that factual scenario, that the one or the two is not material to that, is it? In terms of the reasonableness of the force used by defendant, by defendant, Officer Rahim? And then just getting straight to it, my question is how do you distinguish our precedence, such as ward law or other cases in which there's a similar effort with an individual to place them under arrest and some injury, and in this case, quite a serious injury ensues? I think some of the facts in the run-up to Officer Rahim's decision to use force with Mr. Hedgpeth are distinguishable from the cases that the appellees have cited and that Your Honor references. This wasn't a situation where Mr. Hedgpeth was in any way attempting to flee. He was, according to Marcus Lee, standing, and at most, the resistance that he offered was not giving his right arm once Officer Rahim already had his left arm. And I think that would be distinguishable from an instance like in Scott, for example, where the defendant tried to escape from the vehicle, or in other cases where the opposition is sort of active and oppositional, where they pull away. What about, I mean, that's why I was asking about, for example, Overwetter, where you have a woman dancing and listening to her earbuds in the Jefferson Memorial and sort of, you know, what, there's not a violence or attempt to flee or that kind of behavior, and there our court found that the force used was not unreasonable. I think Overwetter is distinguished because there was no injury that resulted from the plane at the Met. That's a different question, it seems to me, and here's how I see it as being a different question. One question is the maneuver that's used by the police to take down the suspect, your client. And given the circumstances, as Judge Pillard says, there's some precedent that suggests the maneuver is permissible given the circumstances. And I understand your point on that, I'm just going to distinguish the two things. The second question is whether smashing his head into the wall, I'll just use that as a shorthand, was an accident or intentional. And on that, your argument, I suppose, is that there's at least enough evidence to show that it might have been intentional to get to the jury. The district court concluded that it was accidental. And on that, the only real evidence we have, since your client can't testify to the events, are the officer, who says it was not intentional, and then Lee. And then Lee's testimony really hurts you on that, as you're probably aware, but I just want you to tell me how we can overcome that. Because Lee says his observation of the event is that he does not, and I'm paraphrasing here, he did not think the officer was intentionally smashing your client's head into the wall, that it was not, it was in essence an accident. How do we deal with that? Because that, to me, is a critical piece of this. Was it intentional or was it an accident? If it's intentional, or there's enough evidence that it was intentional, then you should get to the jury. If there's evidence, the only evidence is that it's an accident, then you don't. I do agree that there is some testimony from Mr. Lee that does hurt us on this point. I believe he says that he believed that it was intentional for the officer to take him to the ground, but not intentional to take him into the window. And I guess my response to that would be, based on the nature of the injury, I think a reasonable juror could infer that there was more to it than that. And I think that even though Mr. Lee's testimony provides a significant amount of our case, because Mr. Hensbeth doesn't remember the incident, in this sense, the officer's action should be viewed objectively. And I don't think that Mr. Lee's interpretation of the officer's subjective intent is necessarily relevant to the analysis here. And we did cite the case Santos out of the Ninth Circuit that is very analogous to this situation in which the court of the Ninth Circuit held that the nature of where a defendant doesn't, or excuse me, where a plaintiff doesn't remember the incident, where the nature of the injuries are so in conflict with the officer's testimony as to what actually happened, a reasonable juror could infer that the officer did in fact cause the injuries and could make a credibility finding on that basis. And given that- Because the whole case on this point, on this accidental versus intentional, the whole case turns on the officer's state of mind. Well, I think it's undisputed that he- That's not a hostile question. Sure. I think that given where Mr. Hedgepeth was positioned and just viewing the situation objectively and, again, going back to the severity of the injury, I mean, on the one instance we have Officer Rahim testifying that he merely touched Mr. Hedgepeth by his bicep and that that made him fall over and then that caused such an injury. So I think you take what the trial court found could be easily discredited. Officer Rahim's testimony could be easily discredited by a reasonable fact finder. And you could take the information from Mr. Lee in which he describes an intentional takedown, but his interpretation of that is that it's not necessarily intentionally taking him face first to the window grate. Again, I would go back, again, to the nature and the severity of the injury that even a reasonable- Did you introduce evidence or was there evidence that the physical consequence of the conduct could only have come about if the officer intended to hurt your client? I believe that some of the expert reports speak to that, speak to that issue. Dr. Shiner's report and others, I believe they would opine that at least it's a reasonable probability that it would have been enough force required that would have evinced intent. Intent to hurt as opposed to intent to takedown because for these purposes, I think the district court allowed that there was an intent to use the maneuver. Correct. Yeah. Right? Sorry to answer for you. Well, I wasn't sure if the district court was definitive on that point. There was some discussion about it. I mean, my interpretation of it- I thought the district court gave you the benefit of the doubt on that and said that there was an intent to use the takedown maneuver as opposed to there were some testimony from the officers, as I recall, that actually there wasn't even a maneuver. It was just kind of an accident that Mr. Hetchbeth hit the ground at all or hit the window at all. Right. I think the district court gave you the benefit of the doubt on that and said, no, there was the maneuver used. Then the question becomes whether there's anything in the record sufficient to get past summary judgment to support the proposition that if you allow that the maneuver was used, then the officer nonetheless intended to harm your client in a way that led to the injuries. Right. And I think that was largely based on Marcus Lee's testimony that he just didn't perceive the event. He didn't perceive the officer's intent in that manner. Again, I think a reasonable juror could infer based on Officer Rahim's testimony, based on other facts in the record. For example, the witness statements that is relatively undisputed. There were several witness statements that were taken that were never produced, that were never preserved by the Metropolitan Police Department. Officers Rahim and Ryder both categorized the event as not a use of force incident, which would have triggered a series of investigations and things like that. But I take all that. But Lee has no incentive to testify in favor of the officers in that circumstance, right? Whereas the officers obviously do, which is your point. Exactly. And, you know, the district team would care. But that's a problem, right? Because Lee's testimony hurts you. We have cases as well, particularly in a shooting incident where the victim is dead and can't testify about what happened, that we should be somewhat skeptical at the summary judgment stage of officers' one-sided testimony. But here it's somewhat analogous to that because your client can't testify about the events. But we have this observer who says his perception of it is that it wasn't intentional. And he, correct me if I'm wrong, has no real incentive to testify in favor of the officers for any particular reason. He's just saying what he thinks, right? I agree. And I think he has no real incentive to testify in favor of Mr. Hedgeth either. He characterizes his relationship with him as someone he used to know, essentially. You know, I would just say that we're somewhat at a disadvantage in that respect. There may have been other witnesses. I mean, there was testimony from Tyler Davidson Webb that people were screaming police brutality. There was testimony from both Tyler Davidson Webb and Marcus Lee that they saw the officers taking witness statements from two African-American women on the scene which vanished in the same way the original, the so-called phantom African-American male that Mr. Hedgeth supposedly punched. And the officers' own logbooks? There's some kind of book they're supposed to be carrying? No, the notebook. Their notebook was missing. They lost their notebook from the time period in which this incident occurred. This Sergeant Kearn, who was the commanding officer who responded to the scene, was deposed at length on these issues and essentially had no information that maybe the witness statements got stuck in a file cabinet drawer somewhere or something to that effect. You know, if you take all of these little things together, I think that a reasonable fact finder could make some inference of intent here, even more so than what Marcus Lee gives us in the incident. You know, why is Officer Rahim asserting that the only force he used was touching his bicep by the fingerprints? Why was there such a shift in rationale for the arrest? Where did the notes go? Where did the witness statements go? Those are concerning facts that raise an inference. I guess the question is, what is the inference that they could permissibly raise for a reasonable jury? If you don't have evidence to go to a jury on the issue of intent, do you still have a claim? I think so, because I think the jury should interpret the officer's actions objectively, looking at what evidence we do have as to what the force was used, comparing that to the injury that the plaintiff sustained, and then drawing inferences based on that. I find, I know our cases, you're correct, that we have prior cases that talk about, on the flip side, force used being reasonable and mention, two or maybe even three of them that mention, you know, quite similar situations where there's an arrest, somebody's, you know, taken down. But, you know, another factor supporting that the force used was reasonable was that the injuries, if any, were very slight. And I wondered about that logic. I mean, if the force used to, you know, to do an individual is the exact same force that caused slight injury in those other instances, but here it's a big guy, there's an awkward turn, and there's a wall right there with these sharp muntins, does the fact that he's more seriously injured actually, is it actually probative that the force used was not reasonable? I think so. I mean, I think it logically follows that the harsher the force, so to speak, the more likely the seriousness of the injury. So if you're in a situation where the officers put someone's hand behind their back and they do it a little bit rough, you know, or twist it a little more than they probably should, you know, that still can fall within reasonable amount of force to effectuate arrest, and the cases are consistent in that respect. But when you have a situation where a tactical takedown is done on the one hand, and someone suffers a traumatic brain injury as a result of the fall from the tactical takedown versus maybe someone has a skinned knee, I think that you could infer a difference in the amount of force used there. Thank you. We'll give you some time on rebuttal. Thank you. Thank you. Good morning, and may it please the Court, Carl Schifferle on behalf of Officers Rahim and Ryder. I'll start with the excessive force claim. And it is true that the only evidence that would have possibly supported this claim by the plaintiff would be the testimony of Mr. Lee. But Mr. Lee was clear in his testimony that the force used was designed and appeared, based on his observation of it, to secure Mr. Hedgefest's custody, to cuff him, and that the fact that his head hit the window appeared to him, as he observed it, not special. How does he know? How does he know what the officer really was trying to do? And I don't think the question really is subjectively what was in the officer's mind, but what appeared reasonably, objectively speaking, as he viewed the encounter. And I think that is very informative. Well, I don't think that's right because, objectively, his head hit the wall, the side of the building. The question of whether that was okay or not, okay is the wrong word, but liable or not, depends on whether that was an accident or whether that was intentional. And that, in turn, correct me if I'm wrong, depends on whether the officer was trying, because he was angry, or responded to push his head into the wall, or whether he was merely trying to take him down, and it was an accident that he slipped or awkwardly fell into the wall. So it all depends on whether the officer's, I'll use the word intent, was to take him down, for me at least, was to take him down without hitting the wall, or the officer, in a fit of pique, kind of intended to rough him up a little. And Lee's testimony would be the former. Right, but how does he know? Based on his objective observation of the incident. But it depends on what the officer thought. It depends on what the officer thought at the moment, not what Lee observed. Because the observation, if it was an accident and intentional, the same thing would have happened. Namely, he's pushed to the ground, falls into the wall. It depends what he wanted. But it is still an objective test. I recognize the distinction Your Honor is making, and I do agree with that. That, for example, a gratuitous act of violence that serves no governmental interest, yes, would be a violation of the Fourth Amendment. But that is not Lee's testimony. Lee is the only one who even supports the notion that this was an intentional takedown. Suppose we had no witness here, same facts. Does it get to a jury? No Lee testimony, in other words. Right. No, Your Honor, because it's still the plaintiff's burden of proof. As any Section 1983 claimant, he has the burden. But that would mean any time the plaintiff gets killed or gets injured so severely that he or she can't remember what happened, that the officer gets summary judgment in an excessive force claim, which strikes me as can't be right. Well, certainly there's going to be some consequences from the role that the plaintiff has the burden of proof. And perhaps in some situations that will be true. I recognize the concern, but it's still fundamental that the plaintiff has the burden of proof. I would also say that is not this case. We do have that witness. Right. Why wouldn't the sensible rule in these circumstances be you end up with an injury like that, and it depends on whether it was an accident as a result of otherwise permissible police activity or whether the police, for whatever reason, a rogue officer or what have you, intentionally roughed someone up, that the jury should determine that. I guess I would disagree with the general rule. I mean, the facts of each case are going to be different, and so the court might want to look at the particular facts differently. Again, that's not this particular case. Not only do we have this witness, it's the defendant's position. The reason Mr. Hedgepeth can't recall anything is because he was severely intoxicated. It is the equivalent of 14 alcoholics. And that can't be right. It can't be you ask for it, you get it. So you're drunk and you can't remember, therefore the police have a free shot. If I understood the premise of your question, Your Honor, it's unfair to the plaintiff when the plaintiff can't produce evidence. My point is that the reason the plaintiff can't produce evidence is the plaintiff's involuntary actions, and there's not a real unfairness there. I don't want to put words into his mouth, but I think Judge Kavanaugh's reaction to that answer was, really, someone is in some way unable to recall and therefore open season, as long as their inability to recall was based on their own, at some level, bad action? No, Your Honor. I'm just talking about this particular narrow question, which doesn't even apply here. We have, as in any case, we're going to have additional facts, additional evidence. We're going to have the testimony of officers. There's going to be evidence in the case. And not only do we have the testimony of officers, we have the testimony of Mr. Lee. We have, and I would submit, too, that in addition to Mr. Lee's own characterization, based on his observation of the incident, we have the fact that Mr. Hedgepeth was facing away from the building at the time that the officer tried to cuff him. So it was not obvious that Mr. Hedgepeth would spin entirely around and hit his head. This is not a situation where it was obvious, based on the situation of the individuals, that this would happen. And you have to recognize that officers act, as the Supreme Court has recognized, under difficult, tense circumstances. I think that's a different question. What you just said really goes to whether the takedown itself was so dangerous that it shouldn't have been attempted in that particular spot. And I think you have a good case on that as to the takedown. My further point is whether the smashing into the window, you know, smashing is paraphrasing, I understand, is an accident or intentional. And, you know, we have these cases here where, as I think you've argued a bunch of them, like the Flythe case where Judge Tatel wrote the opinion where the victim ends up dead and said we shouldn't accept what may be a self-serving account by the police officer in those circumstances because, as Judge Tatel wrote for the court, history is usually written by those who survive to tell the tale. And there is Mr. Lee. We have that witness who is a friendly witness for the plaintiff. Well, you're crediting Mr. Lee. And, first of all, I'm not sure that he really counts as a friendly witness for the plaintiff. I think he is just an acquaintance. He's someone who hasn't seen this fellow for a long time. He hesitates to take him home. I think, in part, if you want to make your point about that, you can. Well, yeah, I would say the reason he hesitated to take him home, he was on friendly terms, and he said, I'd be happy to do it, but he's too hard to handle. He won't go. He can sometimes be difficult to handle. And if I ran into somebody that I used to work with 10 years ago and he were intoxicated and I might hesitate to take that person on into my own custody and take that person home, it's not like they were out together, was my point. But, anyway, you're willing to credit Mr. Lee. Well, for sake of summary judgment, yes. For sake of summary judgment. So Mr. Lee's testimony on page J87 is, I didn't think it was right what was happening to him. I didn't think that was warranted, the amount of force. I didn't think that was warranted, the amount of force. So to him, this looked like something alarming. That this, the way that, and he said, I didn't think that he intended his head to crack open, but I did think that he was using more force than was warranted under the circumstances. I didn't think that was warranted, the amount of force, and the fact that he was visually, seriously hurt. I wanted to make sure that somebody who saw the whole thing could do what I'm doing now, which is be a witness. He thought there was something wrong that went on. Well, but I do think we should distinguish between an individual's opinion about whether the force is reasonable, a purely legal question, and the factual question of whether the officer, it appeared objectively, intended that Mr. Hedgepet hit his head, or that the officer was merely trying to cuff Mr. Hedgepet. That is what Lee testified. He was merely trying to cuff him. Mr. Lee's testimony doesn't appear to be dispositive on either question, because he can't be inside Officer Rahim's head and because, as you point out, it's a legal question whether the force use was reasonable. But all I'm pointing out is that it seems suggestive on both, and it doesn't cut all in favor of Officer Rahim. I think it does. I think at least it's not sufficient enough for the plaintiff to carry his burden of proof. Judge Kavanaugh, I would say that it is relevant that the test that the Supreme Court has announced for reviewing excessive force cases, that you have to recognize that an officer is acting under tense, difficult, and rapidly evolving circumstances. And what that would mean in this situation is that an officer is not going to know in advance, be able to predict with clarity how an individual is going to react to a certain application of force or the physical dynamics that will resolve when force is applied. I'm not questioning the takedown necessarily. Right, but the product of the takedown. So what's your response on that score? What's your response to the opposing counsel's argument that if you take apart, if you disaggregate the takedown from the consequence of the takedown? And we're only looking at the consequence of the takedown. So we'll say, just assume for purposes of argument, I'm not saying we necessarily come down one way or the other, but assume for purposes of argument that it was okay to implement the takedown maneuver. Then the question becomes, does the injury that resulted therefrom, is it of a character that indicates that there was an intent to physically harm Mr. Hedgepeth when he was being subjected to the takedown maneuver? And on that, the argument that opposing counsel has given is if you look at the consequence alone, that would tell you that it had to result from an intent to hurt him. What's your response to that? Right. So I disagree. The consequence alone cannot be determinative. We have these testimonies. We have the fact that Mr. Hedgepeth was facing a way for him to go. Do you mean the consequence alone can never be determinative? Because I would think that at least as a matter, conceptually, you could have a circumstance in which you could have a consequence that is so severe that there could be persuasive testimony or at least enough testimony to get the jury to the effect that that kind of consequence, even given a takedown maneuver, couldn't have occurred unless the officer intended to bash the person's head into the side of a wall. I'm not saying that's the case, but I'm saying that's conceivable. It is at the outer edge of conceivable. And the reason I say that is because it is unpredictable the exact consequence that would result from a particular application of force. And it may be that a particular application of force 99,000 times or 999 times out of 1,000, there's no injury, but just by odd chance, that one time out of 1,000, it does result in a serious injury. That doesn't mean that the use of force was unreasonable or that there's sufficient evidence to carry that burden. We do have, I mean, there are cases, you're right, around the country where a takedown maneuver that I gather is a relatively standard police aid to arrest results in some moderate to serious injury. Right, it can happen. That doesn't mean it's unreasonable just because it does. What was, in your view, the basis for the arrest? So the basis for the arrest was, well, there was probable cause as to either assault and other offenses or to public intoxication and at the very least qualified immunity as to public intoxication. I think it's notable that in the replied rate, Planish doesn't even address that argument. Let me just back up. On the assault, if you take the facts in the light most favorable to the plaintiff on this record, and that's where I think Mr. Scrifano's argument about the two versus one and the district court analysis of that is actually quite important because the facts read in the light most favorable to the plaintiff are that there was only Lee. There was no other victim of Hedgepeth's assault and that Lee said, hey, we're just goofing around. So there wasn't actually, if you take the facts in the light most favorable to the plaintiff, any basis for arrest for assault. No, we disagree. We think the district court was correct. It said that there was no evidence supporting this theory that there were two separate transactions. All right, set aside the assault. On public intoxication, what is the policy on finding someone downtown who is intoxicated? That's a misdemeanor, and those people, if the officers choose, can be arrested? No, Your Honor. The law provides that if a person is intoxicated in public, there has to be some form of public intervention, whether getting the individual home safely, taking them to a facility, or a detoxification center. It's a crime if the person is a danger to self or others, which is the element that was. . . Just let me back up. When you say that the policy is that they take them, is that that the police take them to those places, or is there a service they call? If you aren't with people who are willing to take you home, how does that actually work? Because I read that part of D.C. law that says we take them to a shelter, and it's in the passive voice, so I wondered who is it that actually does that? Right. Well, I think as a practical matter, the burden probably falls on the officers. I mean, they're always the ones sort of first on the scene, as the officers were here. But I did want to say, back on the excessive force claim, I didn't necessarily fully develop the qualified immunity argument. So even if the force arguably was unreasonable, there is a qualified immunity doctrine which protects where there is that hazy border between excessive and acceptable force. An officer looking at this court's case law, the Scott case, the Martin case, Overwetter, Ward law, Wasserman, they all . . . I'm going to repeat myself now, but that goes to the takedown being okay, or at least lawful. We're not producing liability here. But it doesn't answer the question necessarily of the intent versus accident. Because you would agree, and I assume, that if the officer in these circumstances intentionally slammed his head into the wall, there would be no qualified immunity. Intentionally slammed his head into the wall. If it was a gratuitous act to further no government interest. That's correct. So qualified immunity doesn't help you if there's sufficient evidence, and query what is sufficient, but there's sufficient evidence that the officer intentionally slammed his head into the wall. Qualified immunity wouldn't alter that calculus, as I see it. I would say gratuitous with no governmental purpose. It would have to be obvious. It would have to be an obvious case, looking at it objectively. In someone, you know, in the standpoint of Mr. Lee, looking at it objectively. And he came, I mean, he's reporting what he observed. I guess the problem with that systemically, just thinking about a bigger picture here, is that where there aren't witnesses observing, and I realize you have Lee here, so I'm going to put that to the side, but where there aren't witnesses observing, that's going to, again, mean that officers generally will get summary judgment even when they intentionally slam someone's head into the wall. No, no. There won't be a witness in cases without witnesses observing. Well, there will be the testimony officer. I mean, they do have to testify truthfully. They're under oath. Right, but usually the jury is the body in our system that weighs credibility in a circumstance like that, not the judge reading a paper record. Right, and I'm not here to advocate some general rule. It will depend on the facts and circumstances of each case. And the facts and circumstances here don't give rise to the concern that we submit, because we do have that testimony of Lee. And it is the plaintiff that has the burden of proof, and there's going to be consequences to having that burden. Maybe in every case it's not particularly fair, but one could think. What do we do about what counsel said about the missing notes and missing? There was no argument raised in the plaintiff's brief. There's some mention of that in the statement of facts, but there's no argument that was raised in the brief. So that argument has been forfeited, and it wasn't presented before the district court, at least in any form that they can say the district court erred in some way in not addressing it. They didn't ask for any particular relief before the district court. At least it was not preserved at all. So just circling back, the offenses that give rise to reason for arrest, you said the assault on other civilians and the public intoxication. And the public intoxication, the reason on these facts to believe that Mr. Hedgepeth was a danger to himself or others was what? The testimony that he was severely intoxicated. This is not a normal level of intoxication, that he was heavily impaired, and that's corroborated by the fact that he did have a low alcohol level indicating 14 alcoholic drinks in his system at the time. So that level of severity does indicate a danger. The fact that this was a busy commercial intersection at night, there's some cases that support the proposition that in that situation the element of danger to himself or others is satisfied. What was the numerical? Remind me, the numerical BAC was? It was 14. I know 14 drinks was the number. I don't recall offhand the 14 drinks. But if somebody's of a danger to himself or others, then they don't go to a shelter or detox, they go into the lockup? Well, it is a crime. And the question here is not whether the crime was committed, but whether the officers had probable cause. And even more, whether they had arguable probable cause. I understand that. Just because we're not focusing on the qualified immunity doesn't mean that we don't understand that that is an extremely important part of the analysis. We're just trying to go step by step. And I'm trying to understand whether there is, in fact, an objectively reasonable basis for arrest before putting the qualified immunity lens on it. And part of what's puzzling me is if an individual is in a condition that it is a crime, I just wanted to know, do you send them to a shelter? Or is that only if someone is just, you want to get them off the street? Well, they may be taken to a detoxification center first or receive some sort of medical treatment first before they're taken and actually processed as an arrest. But nevertheless, it would be an arrestable offense. And the other circumstances, I didn't get through them, but to respond, the fact that Mr. Lee said, I can't take him home. He's too hard to handle. He won't go. The fact that Mr. Hedgetest was verbally belligerent. He was very noncompliant. These facts and circumstances gave rise to the suggestion that anyone who tried to intervene, whether it's the officers  when somebody is intoxicated in public, that that's a threat to any person who might try to intervene to assist him. He's a threat to passerby. There's a lot of people around. Even assuming that Mr. Hedgetest didn't push that tall black male, you can see how that situation might develop with a lot of people around, Mr. Hedgetest being very belligerent. Was there screaming? There's reference to screaming and references to the Incredible Hulk. And I'm just wondering, was it undisputed that the screaming occurred independently of screaming in response to the efforts of the officer to put handcuffs on him? We do think it's not genuinely disputed that that was the case. The officers both testified the screaming and yelling was before the arrest. Although Lee, who you're putting credence on, said it didn't start until after the efforts to arrest him. I think his testimony is ambiguous on that point. I don't think it's enough to create a genuine dispute in light of the officer's testimony. But in any event, it was contemporaneous. So I think the officers were still entitled to rely upon that. And it's just further demonstration of the fact that he was a danger to himself or others, given this very volatile situation, his intoxication, other circumstances. Did you watch the little few-second video? Of course, Your Honor. Did he seem to you to be dangerous? Well, first of all, the few-second video doesn't capture the entire incident. It does corroborate the fact that he was swaying. We do think that it shows that he was swaying back and forth. And, of course, as I said, the video doesn't capture the entire incident. And there's no dispute, even according to Mr. Lee, that Mr. Hedgepeth was quite belligerent, yelling, very aggressive, verbally aggressive, very angry, like the hall. That evidence was all undisputed. The testimony was consistent on those points. And I stand beyond my time, unless the Court has further questions. Okay. Thank you. Thank you. I'll give you a few minutes for rebuttal. If I could just make a couple points on the issue of public intoxication. A few things. It is very much in dispute whether Mr. Hedgepeth was verbally belligerent or was screaming up until the point that he was told he was being placed under arrest. Marcus Lee testifies in his deposition that he did not start screaming until Officer Rahim said, I'm going to put you under arrest. And he started screaming. The only thing that Marcus Lee testified him screaming was things to the effect of, no, I didn't do anything. There's no kind of belligerence in the interaction, in the run-up to the decision to arrest Mr. Hedgepeth. In fact, Mr. Lee characterizes this, Mr. Hedgepeth being not, he says Mr. Hedgepeth wasn't being coherent. He wasn't answering their questions. And at the point where they told him, we've decided that we're going to arrest you, that's where I remember fairly clearly him starting to yell, saying no. And that's in Marcus Lee's testimony. So the screaming doesn't actually occur. What we have before the decision to arrest Mr. Hedgepeth is essentially him not answering questions. We have a video of him in our interpretation of the video as well as Mr. Lee's interpretation of the video is that he's not swaying. He's not a danger to himself. The most heavily relied on fact to assert that Mr. Hedgepeth was a danger to himself was this throwaway statement by Mr. Lee in which he said he could be hard to handle. The pushing, the officers believed that he had pushed someone and then Lee says he's hard to handle and then he's not being cooperative and obviously the officers observe him and decide that he's intoxicated. This is why it's hard to be a police officer. If you don't arrest him and he stumbles across the street and gets hit by a car, the officers are going to feel pretty bad about that. Or if they don't arrest him and he goes and just punches someone, beats them to smithereens, the officers are going to feel bad about that too. Like they didn't do their job if they don't arrest him. That's why it's hard to be a police officer and make a decision like this whether to arrest. That's separate from the force question. But on the arrest question, when you put the qualified immunity thing on it and you're thinking about the officers are there to try to protect him and protect the surrounding people, it's a tough job dealing with people who have had 14 drinks in them. Your Honor, I completely agree with Your Honor to the extent that you're relying on the facts that you asserted, which I think are facts that are in the defendant's light. I think that the facts most favorable to the plaintiff in this instance show only that the officers witnessed Hedgepeth maybe punch or push Marcus Lee. They approached. Marcus Lee immediately told the officer, hey, we know each other. It's not what you think. At that point, there's no issue in terms of any physical confrontation or Mr. Hedgepeth punching or pushing people. Mr. Lee then goes on to testify that he's just simply refusing to answer their question. But the officers, right, I see your point about the defendant's light. If the blood alcohol test came back and showed he'd had two drinks, that would be a much stronger case. It comes back and shows that they had 14 drinks, and obviously they don't know that at the time, I realize, but it does suggest that they weren't crazy to think that he was wasted. Right, and I've seen a few things in the appellee's pleading suggesting that it's 14 one-ounce drinks. Now, I'm not sure if that means 14 shots or 14 one-ounces of beer, if it was 14 ounces of beer. Well, if it's 14 one-ounce beers, that's nothing. So that wouldn't be. Right. In any event, if we're taking Marcus Lee's testimony as to what Mr. Hedgepeth's behavior was in the run-up to the decision to arrest, which I think the court has to do at this stage, it's not this grand thing that the appellees have made. He's screaming, cursing, this and that. Marcus Lee is clear. He's just refusing to answer questions. And if you take Officer Ryder's testimony, Mr. Hedgepeth did produce his identification in the incident, so he's at least cooperating at some level. Because, as you recall from Officer Ryder's testimony, Officer Ryder missed the whole takedown because the split second he looked down to take a picture of Mr. Hedgepeth's license that he produced, he missed the whole thing. So there is some cooperation. It's more of a failure to answer questions. The yelling and the belligerence doesn't come until after the decision to arrest has been made. What's your best site for that, for when the yelling starts? Because the officers are invoking his yelling as part of the belligerence that they believe supports an arrest for public intoxication. And I take your position to be that the record doesn't support that, or at least a reasonable jury could find otherwise. And is that Mr. Lee's testimony? I think it's very much a fact and dispute as to when the yelling started. Mr. Lee testifies that Mr. Hedgepeth doesn't start yelling until he's told by Officer Rahim, I'm going to put you under arrest. And then Officer Rahim grabs his left hand, and then it's at that point the whole transaction begins. If I could make just another point as well on Officer Rahim's intent. Again, it seems as I'm hearing your honors are somewhat interested in Officer Rahim's intent and the lack of evidence and the evidence of Mr. Lee stating I don't think he intended to harm him in that way. I do think the court can make reasonable inferences in the plaintiff's favor based on Officer Rahim's own recantation of what happened, that he just touched him on his biceps and that he fell over as a result of that. I think the lack of evidence, the missing notes, the failure to preserve the witness statements, the fact that they designated this as a non-use-of-force incident and there was no further investigation, to me it seems a reasonable inference you could draw on the plaintiff's favor is that Officer Rahim is acting with some ill intent. Are you also relying on the portion of your deposition of Mr. Lee in which you ask him did it result in a loud noise, how loud are we talking, and Mr. Lee says very loud. I was like it was so loud that everyone who was walking with an earshot stopped to look at what the police officers were doing. It was so loud that a person who was inside Den of Thieves, the bar, actually came outside to look and see what was going on in front of his store. That was how loud it was. Absolutely. I think a reasonable inference can be drawn from that as well as to the extent in which Officer Rahim, or the level of force that Officer Rahim used in order to subdue, again, a suspect who essentially was just refusing to give one arm to him and not pulling away, was not actively opposing the officer, wasn't trying to flee, wasn't trying to escape, and not to mention Officer Ryder is right there on the scene. So I understand it's difficult to second-guess officers in these situations, but I could see a situation where an officer is by himself, that a takedown might be more reasonable or more necessary, but even Marcus Lee testifies that he didn't understand why Officer Ryder did that. But we can't second-guess, just to say that. I mean, that's clear, that we can't second-guess, and that one officer should be able to be paying attention to taking down details of the license, and the other officer should be able to manage a suspect if the suspect is being cooperative. On the slamming of the head, is it really just what is in his mind? Because counsel says, well, based on our own experiences in life, we can distinguish sometimes when we're observing someone who is trying to take someone down and accidentally hits their head, and someone who's really trying to push someone's head into a wall. Those two things, based on our experience that we observe, can be distinguished. And Lee here says quite succinctly, I don't think he meant for Jonathan to slam his head into the side of the building. I think that's just what happened as Jonathan was falling to his left side. I'm not sure what we're supposed to do with that. Again, I think that's one piece of it, and I think Your Honor was on point asking Counsel Farfelli, how does he know that? If he would have said the opposite, would you have been using it as evidence in your favor? Oh, yeah. You can just say yes to that. Yes. Then it turns out that somebody's observations can be probative. Right. And we are, and we would argue we're at a disadvantage in the sense that, you know, we have a plaintiff who doesn't remember the incident. Now, the felonies would argue that it's because of his level of intoxication. We would argue that it's because of the nature of his head injury that sort of gives him a kind of retroactive amnesia as to the incident. And I think that goes again to the court's point about if someone is shot and there's no witnesses, you know, does that mean that every officer can get away with that summary judgment in every case that comes before the court because the plaintiff doesn't remember? All right. Thank you both. Counsel, the case is submitted.
judges: Kavanaugh, Srinivasan, Pillard